## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 22-40516-btf** |
| **Miguel Angel Arregui and Angela Marie Arregui,** | ) | |
| | ) | **Chapter 13** |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| **Richard V. Fink,** | ) | |
| | ) | |
| Plaintiff, | ) | **Adversary No. 22-04027-btf** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Miguel Angel Arregui and Angela Marie Arregui,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### <u>MEMORANDUM OPINION</u>

Defendants Miguel and Angela Arregui owned their residence as joint tenants from 1999 to 2022.  Though the Arreguis married in 2007, they waited until three days before they filed their chapter 13 petition to record a quit claim deed transferring title in their residence from themselves as joint tenants to themselves as husband and wife.  The purpose of this transfer was to take advantage of the tenancy by the entireties exemption, which would shield the $127,322.00 equity that existed in the residence before the transfer and relieve the Arreguis of a would-be obligation to pay 100% of their individual general unsecured creditors.

Chapter 13 trustee Richard Fink seeks in this adversary proceeding to recover the Arreguis' joint tenancy in the residence and include the equity in the residence in

the "best interests of creditors" calculation under 11 U.S.C. § 1325(a)(4).  The trustee argues that the Arreguis' recordation of the quit claim deed was an actually and constructively fraudulent transfer under the Bankruptcy Code and the Missouri Uniform Fraudulent Transfer Act (MUFTA).

The Arreguis oppose this adversary proceeding.  They first argue the trustee cannot succeed under either theory because the Arreguis' recordation of the quit claim deed was not a "transfer" under either the Bankruptcy Code or the MUFTA.  The Arreguis further argue the transfer was not actually fraudulent because they effectuated it as part of permissible pre-bankruptcy exemption planning, and, therefore, necessarily lacked fraudulent intent.  Finally, the Arreguis argue the transfer was not constructively fraudulent because they received at least reasonably equivalent value.

For reasons explained below, the court determines the trustee has established actual but not constructive fraud under the Bankruptcy Code and the MUFTA.

## JURISDICTION

The court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334 and 28 U.S.C. § 157(a).  This proceeding is statutorily core under 28 U.S.C. § 157(b)(2)(H) and is constitutionally core.  The court, therefore, has the authority to hear this proceeding and make a final determination.  No party has contested jurisdiction or the court's authority to make final determinations.

## BACKGROUND

This adversary proceeding comes before the court as a consequence of the Arreguis' pre-bankruptcy efforts to increase their exemptions in their residence. The parties have stipulated to many of the relevant facts.

The Arreguis purchased their residence in 1999.[1] At the time, the Arreguis were not married and held title to their residence as joint tenants with the right of survivorship.[2] Miguel and Angela married in 2007.[3] And though loan documents the Arreguis executed after they married recognize that the Arreguis were then husband and wife, nothing in the record suggests that any transaction converted the Arreguis' joint tenancy in the property to a tenancy by the entireties until they recorded a quit claim deed in April 2022.[4]

The bankruptcy case currently pending before this court is not the Arreguis' first attempt to obtain a chapter 13 discharge. The Arreguis commenced a prior joint chapter 13 case in July 2019.[5] During the 2019 case, the Arreguis reported that their residence was worth $138,000.00, scheduled $108,690 in total claims secured by the residence, and claimed a $15,000 homestead exemption.[6] Thus, the total nonexempt

---

[1] Agreed Stipulation of Undisputed Facts ¶ 1, ECF No. 13.
[2] *Id.* at ¶ 2.
[3] *Id.* at ¶ 5.
[4] *See id.* at ¶¶ 6–7, 9 (explaining that refinancing and home equity line of credit documents identify the Arreguis as husband and wife and describing quit claim deed filed three days before the petition date).
[5] Chapter 13 Voluntary Petition, Case No. 19-41895, ECF No. 1.
[6] *Id.*

equity in the residence during the Arreguis' 2019 case was $14,310.  The court dismissed the Arreguis' 2019 case on June 24, 2021.[7]

On Friday, April 29, 2022, the Arreguis filed a quit claim deed transferring title to the residence from themselves as single persons to themselves as husband and wife.[8]  The next business day, on Monday, May 1, 2022, the Arreguis commenced their current chapter 13 case.[9]

The Arreguis now value their residence at $230,700.00.[10]  The Arreguis claim two exemptions in their residence, a $15,000.00 homestead exemption and a $127,322.00 tenancy by the entirety exemption.[11]  The Arreguis scheduled debts secured by the residence totaling $88,378.65.[12]  Creditors have asserted a total of $57,673.21 general unsecured claims against the Arreguis' chapter 13 estate.[13]  Of that amount, only $12,912.89 is joint debt.[14]

In September 2022, the trustee filed an adversary proceeding, seeking to avoid the Arreguis' transfer of the residence and recover the joint tenancy for the estate.[15]

The parties stipulated to several of the relevant facts, and the court conducted a trial.  Angela Arregui was the only witness to testify at trial.  In her testimony, Angela explained that the Arreguis transferred the property from themselves as joint

---

[7] Order Dismissing Case on Trustee's Motion to Dismiss Case for Default in Plan Payments, Case No. 19-41895, ECF No. 63.
[8] Agreed Stipulation of Undisputed Facts, Case No. 22-40516, ¶ 9, ECF No. 13.
[9] *Id.* at ¶ 10.
[10] *Id.* at ¶11.
[11] *Id.* at ¶ 12.
[12] *Id.* at ¶13, 14.
[13] *Id.* at ¶ 17.
[14] *Id.* at ¶¶ 18, 19.
[15] Complaint to Avoid Fraudulent Transfer, Adv. No. 22-04027, ECF No. 1.

tenants to themselves as tenants by the entireties on advice of counsel, and that she understood the transfer was necessary because the value of the residence had increased significantly in the time since their 2019 case.  When Angela's counsel asked her about the Arreguis' motivation for changing their form of ownership, Angela explained that she and Miguel would have otherwise had to pay back all of their unsecured debts in their chapter 13 case, and that they did not earn enough income to repay all of their unsecured debts.  And though Angela initially testified that she thought she and Miguel had disclosed the transfer on their statement of financial affairs, she later appeared to remember that she and Miguel chose not to disclose the transfer because they did not believe the change in ownership qualified as a transfer.

Having outlined the relevant facts, the court turns to the legal issues in this adversary proceeding.

## ANALYSIS

The Eighth Circuit has long permitted debtors to transform assets into exempt forms to maximize available exemptions in anticipation of bankruptcy.  *See, e.g.*, *Panuska v. Johnson (In re Johnson)*, 880 F.2d 78, 81 (8th Cir. 1989) ("The law permits debtors to intentionally transform property into exempt assets."); *Forsberg v. Sec. State Bank of Canova*, 15 F.2d 499, 501 (8th Cir. 1926) (discussing policy in favor of exemption planning).  And though permissible pre-bankruptcy planning sometimes involves transfers of assets to exempt forms, there is a threshold beyond which debtors become vulnerable to allegations of fraud.  *See Norwest Bank Neb., N.A. v.*

*Tveten*, 848 F.2d 871, 874–75 (8th Cir. 1988) (discussing distinction between permissible exemption planning and exemption planning with fraudulent intent). When debtors cross that threshold, the Bankruptcy Code empowers a trustee to avoid prebankruptcy fraudulent transfers for the benefit of the debtors' creditors. *See, e.g.*, 11 U.S.C. §§ 544, 548.

In this case, the trustee alleges that the Arreguis' transfer of their residence from themselves as joint tenants to themselves as tenants by the entireties crossed the line. Accordingly, the trustee asks the court to avoid the transfer as actually and constructively fraudulent under both the Bankruptcy Code and the MUFTA.

In the following sections, the court first analyzes whether the Arreguis' transfer was actually fraudulent under federal and Missouri law, then analyzes whether the Arreguis' transfer was constructively fraudulent under federal and Missouri law.

## A. Actual Fraud Under 11 U.S.C. § 548(a)(1)(A) & Mo. Rev. Stat. § 428.024.1(1)

The Bankruptcy Code empowers a trustee to avoid a transfer as actually fraudulent both under § 548(a)(1)(A) of the Bankruptcy Code and under state law. § 548(a)(1)(A) (authorizing trustee to avoid fraudulent transfers); 11 U.S.C. § 544(b)(1) (authorizing trustee to avoid any transfer that would otherwise be voidable by a creditor under applicable law). Though the evidentiary standard under § 548 is a preponderance of the evidence, *Kelly v. Armstrong*, 206 F.3d 794, 801 (8th Cir. 2000), the standard under relevant state law—§ 428.024.1(1) of the MUFTA—is

6

clear and convincing evidence. *Patrick V. Koepke Constr., Inc. v. Paletta*, 118 S.W.3d 611, 614 (Mo. Ct. App. 2003).

Under either the Bankruptcy Code or the MUFTA, to avoid a transfer as actually fraudulent, a plaintiff must prove two elements: (1) the debtor transferred property, and (2) the debtor acted with actual intent to hinder, delay, or defraud creditors. 11 U.S.C. § 548(a)(1)(A); Mo. Rev. Stat. § 428.024.1(1). The court will discuss each element in turn.

### 1. The debtors transferred the property

The first element of a fraudulent transfer under § 548(a)(1)(A) and § 428.024.1(1) is that the debtor transferred property. 11 U.S.C. § 548(a)(1)(A); Mo. Rev. Stat. § 428.024.1(1).

Initially, the parties appeared to agree that the Arreguis' April 29 quit claim deed effectuated a transfer within the meaning of § 548 and Missouri law. In fact, the Arreguis characterized the transaction as a transfer in their brief, stating, for example, "[§ 442.025] specifically allows the type of *transfer* at issue in this case." Debtor Defs. Brief in Opposition to Trustee's Compl. to Avoid Fraudulent Transfer, at 4, ECF No. 15 (emphasis added). But at trial, counsel for the Arreguis contradicted this characterization by arguing that the quit claim deed did not effectuate a transfer, and Angela testified that the Arreguis did not disclose the transaction because they did not believe the transaction constituted a transfer.

Their argument and belief contradict applicable law. "A party . . . need not surrender ownership in an asset in order to effectuate a transfer." *Kaler v. Craig (In*

*re Craig)*, 144 F.3d 587, 591 (8th Cir. 1998).  The effect of the transaction determines its characterization as a transfer, "not the circuity of the arrangement."  *Id.*

The court determines that when a fraudulent-transfer defendant transforms his or her ownership interest from joint tenancy to tenancy by the entireties, the transaction that alters the form of the defendant's interest is a "transfer" of property under the Bankruptcy Code and the MUFTA.  *See, e.g.*, *Konopasek v. Konopasek*, No. SC99816, 2023 WL 4201660, at *5 (Mo. June 27, 2023) (explaining that transformation of husband's interest in individual property to tenancy by the entireties was a "transfer" under the MUFTA); *Olsen v. Paulsen (In re Paulsen)*, 623 B.R. 747, 754–55 (Bankr. N.D. Ill. 2020) (determining that husband and wife's transformation of property from a joint tenancy to a tenancy by the entireties was a transfer).   The Bankruptcy Code and the MUFTA each broadly define the term "transfer" to include any "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" "an interest" in property.  11 U.S.C. § 101(54)(D); Mo. Rev. Stat. § 428.009(12).  When a former joint tenant transforms his or her joint tenancy to a tenancy by the entireties, the owner "part[s] with" "interest[s]" in property: the joint tenancy interest and all of the characteristics that accompany that form of ownership, including the automatic severance of the joint tenancy at alienation. *See e.g.*, *A/C Supply Inc. v. Botsay (In re Botsay)*, Case No. 20-51440-KMS, Adv. No. 21-06001-KMS, 2022 WL 106580, at *6 (Bankr. S.D. Miss. Jan. 11, 2022) (explaining that transformation from joint tenancy to tenancy by the entireties was a transfer); *United States v. Craft*, 535 U.S. 274, 279–84 (2002)

(describing property rights as a "bundle of sticks" and explaining how the joint tenancy "bundle" differs from the tenancy by the entirety "bundle"). Thus, the transformation of an interest from a joint tenancy to a tenancy by the entireties constitutes a "transfer" under the MUFTA and Bankruptcy Code.

The Missouri statute that enables the transformation of a joint tenancy into a tenancy by the entireties interest, Mo. Rev. Stat. § 442.025, supports the conclusion that the transformation constitutes a transfer. The statute repeatedly characterizes the transformation as a "conveyance," and states that even if the owner does not effectuate the transformation by first conveying property to a third party, "the conveyance [of an owner's interest in property from himself or herself to himself or herself] has the same effect as to whether it creates a . . . tenancy by the entireties . . . as if it were a conveyance from a stranger who owned the real estate to the persons named as grantees in the conveyance." Mo. Rev. Stat. § 442.025. The term "conveyance" means "[t]he voluntary transfer of a right or of property." CONVEYANCE, Black's Law Dictionary (11th ed. 2019). Thus, Missouri law supports the court's conclusion that a transaction that transforms an owner's interest from a joint tenancy to a tenancy by the entireties is a "transfer."

In this case, the Arreguis executed and recorded a quit claim deed transferring their residence from themselves as joint tenants to themselves as tenants by the entireties. Because this form of transaction constitutes a transfer under the Bankruptcy Code and Missouri law, the court determines the April 2022 quit claim deed satisfies the "transfer" element under § 548(a)(1)(A) and § 428.024.1(1).

The court next analyzes whether the Arreguis acted with the requisite fraudulent intent.

### 2. The Arreguis transferred the property with intent to hinder, delay, or defraud creditors

The second element under § 548(a)(1)(A) and § 428.024.1(1) is that the debtor acted with actual intent to hinder, delay, or defraud creditors.  11 U.S.C. § 548(a)(1)(A); Mo. Rev. Stat. § 428.024.1(1).  Although § 548(a)(1)(A) and Mo. Rev. Stat. § 428.024.1(1) each use the disjunctive phrase "hinder, delay, or defraud," courts generally interpret the phrase as establishing a single test: whether the debtor acted with fraudulent intent.  *See Panuska v. Johnson (In re Johnson)*, 880 F.2d 78, 79 n.1 (8th Cir. 1989) (declining to separately analyze the terms hinder, delay, and defraud).

Because direct evidence of fraudulent intent is rarely available, courts analyze all relevant facts and circumstances surrounding a transfer to infer whether the debtor acted with fraudulent intent.  *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 811 (8th Cir. 2008).  Courts have identified the following common law "badges of fraud" that may support the inference that a debtor acted with fraudulent intent:

> (1) a conveyance to a spouse or near relative; (2) inadequacy of consideration; (3) transactions different from the usual method of transacting business; (4) transfers in anticipation of suit or execution; (5) retention of possession by the debtor; (6) the transfer of all or nearly all of the debtor's property; (7) insolvency caused by the transfer; and (8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious.

*Fink v. Wright (In re Wright)*, 611 B.R. 319, 324 (Bankr. W.D. Mo. 2019).  The Missouri legislature has similarly adopted a list of the following eleven statutory

factors a court may consider, among other factors, in determining whether a debtor

acted with fraudulent intent:

> (1) The transfer or obligation was to an insider; (2) The debtor retained
> possession or control of the property transferred after the transfer; (3)
> The transfer or obligation was disclosed or concealed; (4) Before the
> transfer was made or obligation was incurred, the debtor had been sued
> or threatened with suit; (5) The transfer was of substantially all the
> debtor's assets; (6) The debtor absconded; (7) The debtor removed or
> concealed assets; (8) The value of the consideration received by the
> debtor was reasonably equivalent to the value of the asset transferred
> or the amount of the obligation incurred; (9) The debtor was insolvent or
> became insolvent shortly after the transfer was made or the obligation
> was incurred; (10) The transfer occurred shortly before or shortly after
> a substantial debt was incurred; and (11) The debtor transferred the
> essential assets of the business to a lienor who transferred the assets to
> an insider of the debtor.

Mo. Rev. Stat. § 428.024.2.  Because the common law badges of fraud and statutory

factors are similar, courts may use either the common law badges of fraud or the

statutory factors to analyze fraudulent intent.  *Brown v. Third Nat'l Bank (In re

Sherman)*, 67 F.3d 1348, 1354 (8th Cir. 1995).

### a. The circumstances of this case support the inference that the Arreguis acted with fraudulent intent

In this case, the parties focused on Missouri's statutory factors rather than the

common law badges of fraud in analyzing fraudulent intent.  The trustee does not

argue that the following Missouri factors apply: (1) ("The transfer or obligation was

to an insider"), (4) ("Before the transfer was made or obligation was incurred, the

debtor had been sued or threatened with suit"), (6) ("The debtor absconded"), (10)

("The transfer occurred shortly before or shortly after a substantial debt was

incurred"), or (11) ("The debtor transferred the essential assets of the business to a

lienor who transferred the assets to an insider of the debtor"). Accordingly, the court focuses its analysis on the Missouri statutory factors the trustee raised.

The court determines Missouri factors (3) ("The transfer or obligation was disclosed or concealed"); and (5) ("The transfer was of substantially all the debtor's assets") weigh in favor of finding fraudulent intent. Factor (2) ("The debtor retained possession or control of the property transferred after the transfer") also weighs in favor of finding fraudulent intent, though not strongly. In contrast, factors (7) ("The debtor removed or concealed assets") and (8) ("The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred") do not weigh in favor of finding fraudulent intent. Because the federal formula defining insolvency differs materially from the Missouri's insolvency formula, the court's determination of Missouri factor (9) ("The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred") differs under the Bankruptcy Code and Missouri law. As the court explains below, the Arreguis were insolvent under the Bankruptcy Code's definition but were not insolvent under Missouri law. The court will analyze the Missouri factors the trustee raises in order.

### i. Missouri's second factor: the debtor retained possession or control of the property transferred after the transfer

Under the second statutory factor, evidence that a debtor retained exclusive possession or control of purportedly transferred property may support the inference that the debtor acted with fraudulent intent.

The implication of fraudulent intent under this factor is straightforward in a typical fraudulent transfer case.  Fraudulent transfer causes of action typically arise when a debtor has transferred property to a third party, often a friend or relative, while in financial peril.  D. Christopher Carson, *Analyzing and Pursuing Fraudulent Transfer Claims*, in LEADING LAWYERS ON NAVIGATING FRAUDULENT TRANSFER CLAIMS, DEVELOPING AN EFFECTIVE LITIGATION STRATEGY, AND RESPONDING TO RECENT TRENDS AND DEVELOPMENTS (2009), 2009 WL 2510926, at *3.  If the debtor retains control or possession of the property despite the purported transfer, the post-transfer retention suggests the debtor intended to create the false appearance of a transfer while retaining a secret interest—not to effectuate a genuine transfer.  *See Rosen v. Bezner*, 996 F.2d 1527, 1532 (3d Cir. 1993) (explaining implication of fraud when the debtor "represents to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret interest.").  The sham transfer and secret interest suggest the debtor acted with intent to hinder, delay, or defraud creditors.  *See id.* at 1533 ("In many and perhaps most cases, . . . the very fact that the debtor has created and retained a secret interest will be sufficient to hold . . . [the debtor acted to] hinder creditors.").

In contrast, when a debtor effectuates an allegedly fraudulent transfer as a part of pre-bankruptcy exemption planning, the debtor's post-transfer retention does not strongly support the inference that the debtor acted with fraudulent intent.  Specifically, debtors who transfer property as a part of pre-bankruptcy exemption planning do so with the express purpose of maintaining the interest they claim as

13

exempt. *See* 11 U.S.C. § 522(b) (permitting a debtor to exempt property "from the estate"); 11 U.S.C. § 541 (defining property of the estate by reference to the debtor's interests in property). But the Eighth Circuit has repeatedly held that the intent to pursue exemption planning is not inherently fraudulent, even if the transfer was "for the express purpose of placing [transferred] property beyond the reach of creditors" and into exempt forms. *Hanson v. First Nat'l Bank in Brookings*, 848 F.2d 866, 868 (8th Cir. 1988). Because openly and overtly retaining exempt property is inconsistent with the intention to create the false appearance of a transfer while retaining a secret interest (the intention that suggests fraudulent intent outside of the exemption-planning context), post-transfer retention of exempt property does not strongly support the inference that the debtor acted with fraudulent intent.

Here, though the Arreguis retained exclusive possession and control of the residence after they transferred title from themselves as joint tenants to themselves as tenants by the entireties, their apparent intent was to effectuate pre-bankruptcy planning, not to create the false appearance of a transfer. Accordingly, though this statutory factor is present, the post-transfer retention does not strongly support the inference that the Arreguis acted with fraudulent intent in this case.

### ii. Missouri's third factor: the transfer or obligation was disclosed or concealed

Missouri's third factor requires the court to analyze whether the debtor disclosed or concealed the transfer. Mo. Rev. Stat. § 428.024.2(3). Debtors have an affirmative "duty to truthfully disclose these transactions on their bankruptcy schedules." *See Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1354 (8th

Cir. 1995) (analyzing effect of omission from a "bankruptcy schedule"). A violation of the duty to disclose a transfer is tantamount to concealment and may support an inference of fraudulent intent. *Id.*

The court determines this factor weighs heavily in favor of fraudulent intent. The Arreguis transferred title to themselves three days before the petition date, then egregiously and without a valid explanation failed to disclose the transfer on their statement of financial affairs. Angela's trial testimony (which is inconsistent with the Arreguis' previous apparent concession that a transfer occurred) makes clear that the Arreguis decided not to disclose the transfer in reliance on the unfounded legal argument that the quit claim deed did not give rise to a "transfer" under the law. But the Arreguis' erroneous legal argument concerning the proper characterization of the transfer does not absolve them of their duty of candor to this court. Instead, the Arreguis' legal argument in favor of nondisclosure suggests the Arreguis' nondisclosure was part of a scheme to escape the scrutiny that the integrity of the bankruptcy system demands. Their deliberate nondisclosure strongly supports the inference that they acted with fraudulent intent.

### iii.   Missouri's fifth factor: the transfer was of substantially all of the debtors' assets

Next, under the fifth factor, the debtor may have acted with fraudulent intent if the debtor transferred "substantially all the debtor's assets." Mo. Rev. Stat. § 428.024.2. The phrase "substantially all" connotes close to the entirety of, or "some percentage which is very near 100%." *Cent. States Se. & Sw. Areas Pension Fund v. Bellmont Trucking Co., Inc.*, 610 F. Supp. 1505, 1511 (N.D. Ind. 1985). In a case

15

involving a transfer from a debtor to himself or herself, the court must consider the transfer's effect on the sum of the debtor's *nonexempt* assets.  *See Addison v. Seaver (In re Addison)*, 540 F.3d 805, 816–17 (8th Cir. 2008) (distinguishing the facts in that case with the facts in *Norwest Bank Neb., N.A. v. Tveten*, 848 F.2d 871 (8th Cir. 1988), where the debtor "converted almost all of his *nonexempt* property (approximately $700,000) into exempt life insurance policies and annuities" (emphasis added)).  This factor imposes a "principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered."  *Tveten*, 848 F.2d at 879 (Arnold, J., dissenting) (quoting *Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154, 157 (Bankr. D.N.M. 1981)).

The court determines the fifth factor is present.  The Arreguis' schedule A/B reveals that the total value of their assets equals $445,020.25.  Absent the tenancy by the entireties exemption in the residence, the Arreguis' estate would include nonexempt assets worth $129,482.  But the quit claim deed transferring the Arreguis' property to themselves as tenants by the entireties reduced the nonexempt assets available to the estate to only $2,160.  By reducing the available nonexempt equity by $127,322 (from $129,482 to $2,160), the Arreguis' transfer reduced their nonexempt assets by 98.3 percent ($127,322 divided by $129,483).  Because this percentage is "very near 100%," the court determines the transfer at issue was of "substantially all the debtor's assets" under the fifth statutory factor.

### iv.   Missouri's seventh factor: the debtor removed or concealed assets

Under the seventh factor, the court must analyze whether the debtor removed

or concealed assets.  Mo. Rev. Stat. § 428.024.2.  This factor applies only if the debtors removed or concealed the nature and existence of an asset or transfer from their creditors at the time they made the transfer.  *Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 520–21 (Bankr. D. Del. 2022).

The court determines the seventh factor is not present.  The trustee does not allege that the Arreguis removed or concealed the residence itself or concealed the transfer at the time they made it, but instead argues that this element is satisfied because the transfer made the equity in the residence unavailable to the Arreguis' individual creditors.  The trustee cited  no authority supporting the proposition that a transfer of non-exempt property to an exempt form constitutes the removal or concealment of the property itself, and the court is aware of none.  Because the Arreguis did not remove or conceal the residence when they made the transfer, the court determines the trustee has not established this factor.

### v.   Missouri's eighth factor: the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred

Under Missouri's eighth factor, the court must determine whether the value the debtor received as a result of the transfer was at least reasonably equivalent to the value transferred.  Though reasonably equivalent value is a factor that may support a finding of actual fraud, it is also a "hallmark" of constructive fraud, 5 Collier on Bankruptcy ¶ 548.05[3] (Richard Levin & Henry J. Sommer eds., 16th ed. 2018), and is critical to the court's constructive fraud analysis in Part B.4 of this opinion. For the reasons explained in Part B.4 below, the court determines the Arreguis received at least reasonably equivalent value for the transfer at issue in this case. *See infra* Part B.4.  As a result, the reasonably equivalent value statutory factor does not weigh in favor of fraudulent intent here.

### vi.   Missouri's ninth factor: the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred

The ninth statutory factor requires that the court determine whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred.  Mo. Rev. Stat. § 428.024.2.

The Bankruptcy Code and the MUFTA each define the term "insolvent" differently.  Under the Bankruptcy Code,

> "The term 'insolvent' means (A) . . . financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors;

18

and (ii) property that may be exempted from property of the estate under section 522 of this title."

11 U.S.C. § 101(32).  Under the MUFTA,

> "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation; … (4) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under sections 428.005 to 428.059; and (5) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset."

Mo Rev. Stat. § 428.014.  Thus, the definitions of insolvency under Bankruptcy Code and the MUFTA include common elements.  For example, under both the Bankruptcy Code and the MUFTA, a debtor is insolvent if the sum of the debtor's debts exceeds the fair value of its assets.  *See* Mo. Rev. Stat. § 428.014 (defining insolvency under Missouri law); 11 U.S.C. § 101(32) (defining insolvency under bankruptcy law).  And under both the Bankruptcy Code and the MUFTA, the court must exclude the value of allegedly fraudulently transferred property from its calculation of the debtor's assets.  11 U.S.C. § 101(32); Mo. Rev. Stat. § 428.014.

But the calculations for insolvency otherwise differ under the Bankruptcy Code and the MUFTA.  *Compare* 11 U.S.C. § 101(32) (defining insolvency under the Bankruptcy Code), *with* Mo Rev. Stat. § 428.014 (defining insolvency under Missouri law).  Specifically, though both the Bankruptcy Code and MUFTA require that the court exclude fraudulently transferred property from its calculation of debtor's assets, the Bankruptcy Code additionally requires that the court exclude the value of exempt property from the calculation.  *See* 11 U.S.C. § 101(32) ("exclusive of—(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such

19

entity's creditors; and (ii) *property that may be exempted from property of the estate under section 522 of this title*") (emphasis added).  In contrast, the MUFTA does not require that the court exclude exempt property.  *See* Mo. Rev. Stat. § 428.014 (requiring exclusion of fraudulently transferred property but not exempt property). And though the Bankruptcy Code does not require that the court exclude any specific categories of liabilities from its debt calculation, the MUFTA directs the court to exclude from the debt component of the equation the value of the any debts secured by the allegedly fraudulently transferred property. *Compare* 11 U.S.C. § 101(32) (making no exclusion for debts secured by fraudulently transferred assets), *with* Mo. Rev. Stat. § 428.014 ("Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset."). Because the calculations under the Bankruptcy Code and MUFTA differ, the court independently analyzes each below.

The court determines the Arreguis were insolvent during the relevant period under the Bankruptcy Code.  The Arreguis listed debts totaling $177,173.27 on their schedules D and E/F.    The Arreguis listed assets totaling $445,020.25 on their schedule A/B.  After subtracting from the Arreguis' total assets the value of the alleged fraudulently transferred residence ($230,700) and the value of the Arreguis' other exempt property ($201,399), the remaining value of the Arreguis' assets equals $12,921.25.  The sum of the Arreguis' debts ($177,173.27) exceeds the sum of their assets ($12,921.25) under the Bankruptcy Code.  As a result, the ninth factor is present under the Bankruptcy Code.

In contrast, the court determines the Arreguis were not insolvent during the relevant period under the MUFTA. As discussed, the Arreguis listed a total of $445,020.25 assets on their schedule A/B, and listed a total of $177,173.27 debts on their schedules D, and E/F. Of their $445,020.25 aggregate asset value, $230,700 is from their allegedly fraudulently transferred residence. And of their $177,173.27 aggregate debts, $88,378 are secured by their residence. Thus, the sum of the Arreguis' assets, after subtracting the value of their residence but not subtracting their other exempt property, is $214,320.25. The sum of the Arreguis' debts, excluding the $88,378 debts secured by their residence, is $88,795.27. Because their debts ($88,795.27) do not exceed their assets ($214,320.25) under the MUFTA calculation, the ninth factor is not present for purposes of the MUFTA.

In summary, the court determines the statutory factors support the inference that the Arreguis acted with fraudulent intent. In particular, that the Arreguis retained possession or control of the property after the transfer supports the inference of fraudulent intent, though not strongly. That the Arreguis did not disclose the transfer on their statement of financial affairs despite making the transfer only three days before the petition date strongly supports the inference that they acted with fraudulent intent. Finally, that the transfer deprived the estate of substantially all of the Arreguis' nonexempt assets supports the inference of fraudulent intent. The debtor's insolvency under the Bankruptcy Code weighs in favor of fraudulent intent, though the debtor's lack of insolvency under the MUFTA undermines the implication

of fraudulent intent. Taken together, the presence of these factors support the inference that the Arreguis acted with fraudulent intent.

### b. The circumstances of this case establish extrinsic evidence of fraud

Even when a debtor's transformation of nonexempt assets to exempt forms satisfies several badges of fraud or statutory factors, the Eighth Circuit also requires evidence of fraud "extrinsic to the mere facts of conversion of non-exempt assets into exempt." *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 813 (8th Cir. 2008) (quoting *Jensen v. Dietz (In re Sholdan)*, 217 F.3d 1006, 1010 (8th Cir. 2000)). Examples of extrinsic evidence include that the transferor (1) had been sued or threatened with suit prior to the transfer, *In re Addison*, 540 F.3d at 814; (2) radically departed from a previous lifestyle, *In re Sholdan*, 217 F.3d at 1010; (3) materially misled or deceived creditors about the debtor's position, *Panushka v. Johnson (In re Johnson)*, 880 F.2d 78, 82 (8th Cir. 1989); (4) conveyed the property for less than fair consideration, *Graven v. Fink (In re Graven)*, 936 F.2d 378, 383–84 (8th Cir. 1991); (5) continued retention, benefit, or use of property after the transfer, *id.*; (6) transferred property after a creditor obtained a judgment, *Ford v. Poston (In re Ford)*, 773 F.2d 52, 55 (4th Cir. 1985); and (7) made false statements or failed to disclose the transfer on his or her bankruptcy schedules, *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1354–55 (8th Cir. 1995).

The court determines three circumstances provide extrinsic evidence of fraud in this case. Several of those circumstances were also relevant to the court's above analysis of the statutory factors weighing in favor of actual fraud. First, the Arreguis

continue to retain, benefit from, and use their property after the transfer. Second, the Arreguis transferred the property in close proximity to the petition date—within one business day. Third, and most egregiously, despite transferring the property in such close proximity to the petition date, the Arreguis appear to have deliberately omitted the transfer from their statement of financial affairs. This omission is inexcusable and might alone have been sufficient to establish that the Arreguis acted with fraudulent intent.

Because these three circumstances provide extrinsic evidence of fraudulent intent to supplement the statutory factors that are present in this case, the court determines the Arreguis made the transfer "with the intent to hinder, delay, or defraud" their creditors under both § 548 and the MUFTA. Thus, the transfer is avoidable as actually fraudulent.

The court will now analyze whether the transfer is also avoidable as constructively fraudulent under the Bankruptcy Code and the MUFTA.

## B. Constructive Fraud Under 11 U.S.C. § 548(a)(1)(B)(ii) & Mo. Rev. Stat. § 428.024.1(2)

Many of the elements a plaintiff must prove to establish constructive fraud under the Bankruptcy Code are identical to those a plaintiff must establish under the MUFTA. Specifically, to succeed under § 548(a)(1)(B) of the Bankruptcy Code and § 428.024.1(2) of the MUFTA, a plaintiff must prove the following common elements: (1) the debtor had a property interest; (2) the debtor voluntarily or involuntarily transferred that interest; (3) the transfer occurred within a specified limitations period—two years under § 548 of the Bankruptcy Code, and four years under

§ 428.024.1(2) of the MUFTA; (4) the debtor received less than reasonably equivalent value for the transfer; and (5) the debtor suffered from at least one "fragile financial condition," such as insolvency or inadequate capitalization. 11 U.S.C. § 548(a)(1)(B); Mo. Rev. Stat. § 428.024.1(2).  *See also* 5 Collier on Bankruptcy ¶ 548.05[3] (Richard Levin & Henry J. Sommer eds., 16th ed. 2018) (using the phrase "fragile financial condition[]" to describe the requirement under § 548(a)(1)(B)(ii)).   The fragile financial condition that a plaintiff must prove under the fifth element above, however, differs under each fraudulent transfer statute.

Section 548 lists four alternative fragile financial conditions the plaintiff may prove to satisfy its burden under the fifth element: that the debtor (a) was insolvent at the time of the transfer or became insolvent as a result of the transfer, (b) had or was about to have unreasonably small capital, (c) intended to incur or believed it would incur debts beyond its ability to pay, or (d) made the transfer to or for the benefit of an insider under an employment contract and not in the ordinary course of business. 11 U.S.C. § 548(a)(1)(B)(ii).

In contrast, § 428.024.1(2) of the MUFTA provides only two available fragile financial conditions the plaintiff may prove to satisfy the fifth fraudulent transfer element: that the debtor (a) had or was about to have unreasonably small capital, or (b) intended to incur or "believed or reasonably should have believed" it would incur debts beyond its ability to pay.  Mo. Rev. Stat. § 428.024.1(2).

For the following reasons, the court determines the trustee has established that the Arreguis (1) had a property interest; (2) voluntarily or involuntarily

24

transferred that interest; (3) made the transfer within the specified limitations periods; and (5) suffered from at least one fragile financial condition. The trustee, however, has not established under element (4) that the Arreguis received less than reasonably equivalent value for the transfer. Because the trustee has not satisfied his burden of establishing all elements under either the Bankruptcy Code or MUFTA, the transfer at issue in this case is not avoidable as constructively fraudulent.

### 1.  The Arreguis had a property interest in their residence

The Arreguis concede that they had a property interest in their residence. Thus, this element is satisfied.

### 2.  The Arreguis voluntarily transferred title in their residence to themselves

For the reasons the court explained in Part A.1 above, the quit claim deed transferring the Arreguis' interest in the property from themselves as joint tenants to themselves as tenants by the entireties effectuated a "transfer" under the Bankruptcy Code and the MUFTA.   This element is satisfied.

### 3.  The Arreguis transferred title in their residence within the appropriate timeframe under the Bankruptcy Code and the MUFTA

Because the Arreguis effectuated the transfer three days prior to filing their bankruptcy petition, they made the transfer within the applicable lookback periods: two years under the Bankruptcy Code and four-years under the MUFTA.   This element is satisfied.

#### 4.  The Arreguis received reasonably equivalent value

Under the fourth element of constructive fraud, the court must determine whether the value of the consideration the debtors received was at least reasonably equivalent to the value they transferred.

The Bankruptcy Code defines "value" in relevant part as, "property, or satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. § 548(d)(2)(A).  The value a debtor receives in a transfer is "reasonably equivalent" to the value transferred if the property received and the property transferred are "substantially comparable" in worth.  *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548 (1994).  A debtor also receives reasonably equivalent value if the debtor receives property more valuable than the property the debtor transferred.  *See Rebein v. Cornerstone Creek Partners, LLC (In re Expert S. Tulsa, LLC)*, 842 F.3d 1293, 1297–99 (10th Cir. 2016) (determining fraudulent transfer claim failed because the debtor received more than reasonably equivalent value from the sale of property).

The question of "reasonably equivalent value" commonly arises after a debtor transfers an interest to a third party in exchange for nothing or for distinct property of lesser value—not when the debtor transfers property to himself or herself to create an exemption in a formerly nonexempt asset.  *See* David G. Epstein, Bruce A. Markell, Steve H. Nickles & Lawrence Ponoroff, *Bankruptcy: Dealing With Financial Failure for Individuals and Businesses* 504 (West Academic, 5th ed. 2021) (describing the "classic example" of a constructively fraudulent transfer as one in which the debtor did not receive "any economic value in exchange for the [transfer]").  In circumstances

not involving exemption planning, the values at issue are the same whether the court views them from the perspective of the debtor or from the perspective of the estate: the estate is depleted by an amount equal to the value the debtor forfeited, and the estate is enriched by an amount equal to the value the debtor received. *See, e.g.*, *BFP*, 511 U.S. at 535–40 (analyzing reasonably equivalent value and making no distinction between value to the debtor and the value to the estate).

But in the context of exemption planning, valuation is less straightforward. When a debtor makes a transfer to transform nonexempt property to exempt property, the debtor's gain is inherently the estate's (and creditors') loss. Specifically, the nonexempt property the debtor transferred (property vulnerable to creditors) was *less valuable to the debtor* than the newly exempt property the debtor received as a result of the transfer (property protected from creditors). Conversely, the nonexempt property was *more valuable to creditors* than the exempt property. Thus, from the debtor's perspective, the value received was at least reasonably equivalent to the value transferred. But from the creditors' perspectives, the value received was less than reasonably equivalent to the value transferred.

In this case, the trustee asks the court to analyze reasonably equivalent value from creditors' perspectives, rather than from the debtors' perspective, because fraudulent transfer causes of action exist to protect creditors' interests. *See* Brief in Support of Trustee's Complaint to Avoid Fraudulent Transfer, at 4, ECF No. 14 (citing *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991)). Reasoning that "[i]ndividual creditors of the [Arreguis] were harmed by the transfer

into tenancy by the entirety ownership," the trustee argues this element is satisfied. *Id.*

The court disagrees. The trustee's argument makes sense both intuitively and as a matter of policy,[16] and has persuaded other courts. *See, e.g.*, *Rebein v. Cornerstone Creek Partners, LLC (In re Expert S. Tulsa, LLC)*, 842 F.3d 1293, 1297 (10th Cir. 2016) ("Because fraudulent-transfer statutes are for the protection of unsecured creditors, we measure the value received in terms of the effect on those creditors."); *Mellon Bank, N.A.*, 945 F.2d at 646 ("The purpose of the laws is estate preservation; thus, the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors."). But it suffers two fatal flaws. First, it contradicts the language of the relevant statutes; and second, it would severely restrict a debtor's ability to engage in good faith pre-bankruptcy exemption planning despite longstanding Eighth Circuit authority recognizing the ability to do so. *See, e.g.*, *Fosberg v. Sec. State Bank of Canova*, 15 F.2d 499, 501–02 (8th Cir. 1926) (discussing policy in favor of exemption planning); *Norwest Bank of Neb., N.A. v. Tveten*, 848 F.2d 871, 873–74 (8th Cir. 1988) (same).

First, the trustee's argument contradicts the language of the relevant statutes, which direct the court to analyze: "the value of the consideration *received by the debtor*." Mo. Rev. Stat. § 428.024.2(8); *see also* 11 U.S.C. § 548(a)(1)(B)(i) ("if the

---

[16] The court notes that other features of federal fraudulent transfer law consider creditors' perspectives. For example, the Bankruptcy Code defines insolvency to exclude the value of a debtor's exempt assets (an exclusion that increases the likelihood that a debtor's liabilities will exceed assets). 11 U.S.C. § 101(32). The exclusion of property that would be unavailable to satisfy creditors' claims (due to its exempt status) suggests Congress views insolvency from the creditors' perspectives.

*debtor* voluntarily or involuntarily—received less than a reasonably equivalent value in exchange for such transfer or obligation.") (emphasis added).   Because both statutes focus on the value the debtor received rather than the value that became available to unsecured creditors as a result of the transfer, the relevant language does not contemplate analysis from creditors' perspectives.   The court must follow the clear statutory language and analyze whether the value the *debtor* received was at least reasonably equivalent to the value transferred.

Second, viewing reasonably equivalent value from the creditors' perspectives under these circumstances would severely limit a debtor's right to engage in good faith exemption planning—a right the Eighth Circuit has repeatedly upheld.   *See, e.g.*, *Panuska v. Johnson (In re Johnson)*, 880 F.2d 78, 81 (8th Cir. 1989) ("The law permits debtors to intentionally transform property into exempt assets."); *Forsberg v. Sec. State Bank of Canova*, 15 F.2d 499, 501 (8th Cir. 1926) (discussing policy in favor of exemption planning).   For the reasons explained above, from creditors' perspectives, the value of exempt property is inherently less than reasonably equivalent to the value of non-exempt property.   Thus, transfers in pursuit of exemption planning will typically satisfy the "less than a reasonably equivalent value" element from the perspectives of creditors.   Moreover, because exemption planning in anticipation of bankruptcy inherently involves the deliberate transfer of non-exempt property to an exempt form at a time when the debtor's financial condition has made bankruptcy appealing, transfers effectuating exemption planning will satisfy the first and second elements of a constructively fraudulent transfer (that

the debtor had a property interest and voluntarily or involuntarily transferred that interest, respectively) and will typically also satisfy the remaining elements (that the debtor made the transfer within the specified limitations periods and while under a qualifying fragile financial condition).   Thus, viewed from creditors' perspective, transfers in pursuit of pre-bankruptcy exemption planning will almost always be constructively fraudulent.   This result is untenable because—though the Eighth Circuit does not appear to have considered whether pre-bankruptcy exemption planning transfers might qualify as constructively fraudulent transfers—it has long held that "the conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled." *Norwest Bank Neb., N.A. v. Tveten*, 848 F.2d 871, 873–74 (8th Cir. 1988).   Consequently, the court declines to adopt the interpretation the trustee proposes.

The court determines the Arreguis received at least reasonably equivalent value in this case.   The Arreguis transferred title to their $230,700 residence as joint tenants and received title to their $230,700 residence as tenants by the entirety, plus "the sum of $10 and other good and valuable consideration."   Because these values are substantially comparable in worth, the fair market value of the property the Arreguis received was reasonably equivalent to the fair market value of the property the Arreguis transferred.   And from the Arreguis' perspective, the intrinsic value of the newly exempt residence was more than reasonably equivalent to the value of the non-exempt residence they transferred because the transfer shielded the residence

30

from their individual creditors' claims. The trustee has, therefore, not established that the Arreguis received less than reasonably equivalent value under the Bankruptcy Code and the MUFTA.

### 5. Fragile financial condition

The fragile financial condition the trustee relies on to establish its burden under the Bankruptcy Code differs from the fragile financial condition the trustee relies on under the MUFTA. The court separately analyzes the trustee's arguments under the Bankruptcy Code and the MUFTA below.

### a. Fragile financial condition under the Bankruptcy Code

The fragile financial condition the trustee asserts under § 548(a)(1)(B) of the Bankruptcy Code is that the Arreguis were insolvent at the time of the transfer. The court analyzed insolvency under the Bankruptcy Code in Part A.2.a.vi above and determined trustee satisfied his burden to prove insolvency under the Bankruptcy Code. For the same reasons the court determined the Arreguis were insolvent in its above analysis of actual fraud under § 548(a)(1)(A), the court determines this element is also satisfied as to constructive fraud under § 548(a)(1)(B).

### b. Fragile financial condition under the MUFTA

The fragile financial condition the trustee asserts under the MUFTA is that the Arreguis intended to incur or believed or reasonably should have believed they would incur debts beyond their ability to pay. Mo. Rev. Stat. § 428.024.1(2)(b). This fragile financial condition contains a subjective component—the transferor must have subjectively intended or subjectively held a belief that he or she was incurring

debts beyond his or her ability to pay. *Sosne v. Van Vleck (In re Van Vleck)*, 211 B.R. 689, 693 (Bankr. E.D. Mo. 1997).

Here, the court determines the trustee has established the Arreguis "intended to incur" or "believed or reasonably should have believed" they would incur debts beyond their ability to pay. When Angela's counsel asked her about the Arreguis' motivation for the transfer, Angela explained that she and Miguel would have otherwise had to pay back all of their unsecured debts in their chapter 13 case, and that they did not earn enough income to repay all of their unsecured debts. This testimony establishes that Arreguis made the transfer at a time when they subjectively believed they lacked the ability to pay their debts. Thus, the trustee has established a fragile financial condition under the MUFTA.

In summary, the court will avoid the Arreguis' transfer as actually fraudulent under § 548(a)(1)(A) of the Bankruptcy Code and § 428.024.1(1) of the MUFTA. But the court determines the plaintiff has not established the Arreguis' transfer was constructively fraudulent under § 548(a)(1)(B) of the Bankruptcy Code or § 428.024.1(2) of the MUFTA.

## CONCLUSION

For the reasons explained above, the court determines that the Arreguis' transfer was actually fraudulent under the Bankruptcy Code and the MUFTA, the transfer should be avoided, and the Arreguis' joint tenancy ownership should be recovered and reinstated for the benefit of the chapter 13 estate. The clerk of the court is directed to set this matter for status hearing to address the appropriate

disposition of this adversary proceeding in light of other developments and circumstances in the Arreguis' main chapter 13 bankruptcy case.

Dated:  9/22/2023                          /s/ Brian T. Fenimore
                                          Chief U.S. Bankruptcy Judge